

300 Cadman Plaza West, 12th Floor
Brooklyn, NY 11201
P: (718) 852-3710
F: (718) 852-3586
www.stollglickman.com

Hon. J. Paul Oetken                                                     September 13, 2018
United States District Court, SDNY
40 Foley Square
New York, NY 10007

    RE:    <u>Kasheena Shim, Nicholas Clark, Zachery Clark, Giannino Gironda, Amanda Hartman v. Z-Live Inc., Stage 48 Inc., Stage 48 Event Inc., and Pedro Zamora, in his Individual and Professional Capacities</u>

          17-CV-06938 (JPO)

Your Honor,

I am plaintiffs' counsel in the above referenced matter. The parties jointly submit this letter and respectfully ask the Court to accept it as a letter motion for settlement approval of this US Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL") action.[1] This motion is submitted for settlement purposes, and neither party intends for it to be admissible as a party statement in any continuing litigation.

Although the First Amended Complaint was submitted as a putative collective and class action under the FLSA and NYLL, the proposed settlement ("settlement") is submitted as an individual settlement between each of the five named plaintiffs and the defendants, and does not bind or purport to affect the rights of any non-parties to the action. We thus seek approval of the settlement, pursuant to <u>Cheeks v. Freeport Pancake House, Inc.</u>, 796 F.3d 199 (2d Cir. 2015), as well as <u>Wolinsky v. Scholastic Inc.</u>, 900 F. Supp. 2d 332 (S.D.N.Y. 2012).

<u>SUMMARY OF THE ACTION</u>

Plaintiffs were bartenders and servers at a nightclub in Hell's Kitchen known as "Stage 48". Stage 48 operated at times as a nightclub that any member of the public over 21 years old could attend; at other times it hosted private parties. Plaintiffs' complaints arose from a number of

---

[1]     The executed proposed settlement agreement is appended as <u>Exhibit 1</u>.

practices that they asserted were consistent and illegal policies which resulted in plaintiffs failing to obtain all that was due to them in wages and tips.  Defendants deny the practices, and assert that defendants received all they were due.

Plaintiffs asserted, and defendants have denied, the following in their First Amended Complaint;

1. Defendants routinely unlawfully retained portions of plaintiffs' earned tips to remedy what they perceived to be shortfalls in plaintiffs' nights-end reconciliations, and defendants had no procedures for plaintiffs to dispute such chargebacks;

2. Plaintiffs were required to pay taxes on tips earned by other employees who were receiving tips that had to be accounted for, but who were working "off the books";

3. During certain events, defendants retained three percent of some of plaintiffs' tips as permissible credit card processing fees, in circumstances where customers paid cash for "pre-paid bottle service";

4. Plaintiffs were occasionally required to share a portion of their tips with individuals who did not customarily and regularly receive tips;

5. Defendants were required to pay the higher standard minimum wage to plaintiffs, rather than the lower "tipped employees" minimum wage because the practices described above did not meet the prerequisites of the FLSA and NYLL for the tipped minimum wage that "all tips received by such employee have been retained by the employee" and that "[n]o employer ... shall demand ... any part of the gratuities received by an employee, or retain any part of a gratuity". 29 U.S.C.A. § 203; NYLL § 196–d.[2]

HISTORY OF THE LITIGATION

The parties have engaged in informal discovery, which included disclosure of plaintiffs' payroll records from January 2015, and several years of daily revenue reports from defendants' point of sale system, to assist in weighing the strength and value of plaintiffs' claims.  Plaintiffs also have several years of employee schedules from Stage 48, and sample nights' end closing sheets, as well as Plaintiff Shim's payroll records from February 2015.

The parties participated in two mediation sessions, on March 12, 2018, and April 26, 2018, through the SDNY Mediation Program.  Although the parties did not reach a settlement during either of those sessions, the mediation was helpful in narrowing the issues, and getting the parties familiar with their exposures in the case, and the ultimate proposed settlement is for substantially more than defendants' last offer, and substantially less than defendants' last demand.

---

[2] In the original complaint, Plaintiffs asserted that defendants unlawfully retained "service charges" they added to customers' bills during catered parties.  That theory was abandoned in the Amended Complaint after defense counsel allowed plaintiffs' counsel to inspect years of party contracts entered into by defendants, each of which contained language that explicitly advised the clients that the service charges did not purport to be gratuities. See Samiento v. World Yacht Inc., 10 N.Y.3d 70 (2008).

After mediation appeared to fail, plaintiffs submitted substantial, potentially very burdensome discovery demands. As counsel continued to discuss the mode of production, defendants revisited their settlement position, and the proposed settlement is for more than three times the last offer made during mediation.

Plaintiffs' counsel has spoken not only with plaintiffs, but with other current and former employees of defendants', who worked in various relevant positions.

VALUE OF THE CASE

The biggest challenge plaintiffs have faced in this litigation is the fact that many of the events they complained of arose from arguably *ad hoc* procedures which were difficult to substantiate or reliably quantify. At the end of each night, plaintiffs would go into a room with "accountants" or "bookkeepers" from the club, who would perform the nights' end reconciliation. But the accountants and bookkeepers were often replaced with new employees, and some practices plaintiffs complain of could have been the result of individual employees who were defrauding both the club and plaintiffs, rather than consistent policies and practices of the club. This is also why plaintiffs ultimately decided to accept individual offers rather than continue to pursue a class wide settlement.

    A.    THE MINIMUM WAGE CLAIMS

Apart from the appropriate risk discounts, the value of plaintiffs' minimum wage claims are easy to assess, since we have complete payroll records for each plaintiff. The total of the minimum wage claims for all plaintiffs is $22,563.05 going back to 2013; with liquidated damages, the total is **$45,126.10**. Exhibit 2.

    B.    THE UNLAWFUL RECONCILIATION SHORTFALL DEDUCTION CLAIMS

The reconciliation shortfall deductions were not, based out counsel's investigation, frequent or consistent occurrences, and the evidence of such practices is hard to get to; much of the paperwork is destroyed after the numbers are calculated by hand and then entered into the point of sale system, and we have had to rely on random saved documents plaintiffs retained.[3] It is clear, however, that the shortfall deductions were not a frequent practice, and certainly not a consistent one. For settlement purposes, we have generously (to plaintiffs) estimated the average gross reconciliation deductions per night to be $100.00 total, for all shift employees that evening. We assumed fifteen waiters and bartenders per night, for a very rough total of $6.60 per night worked per plaintiff.[4] Gross hours worked by all plaintiffs are 10,427; if we assume an eight hour shift for each, it rounds to 1303 shifts. That rounds out to $8599.80 in damages for this claim. With liquidated damages, the claims would be worth **$17,199.60**.

---

[3]     Substantial paper records were apparently destroyed in a fire, as well.
[4]     Since tips were pooled by all bartenders, waiters, bussers, and bar-backs, a deduction to one employee's tips affected all.

3

C.    THE IMPROPER TAXATION/ UNLAWFUL DEDUCTION CLAIMS

This claim is a complex one. We assumed an average of fifteen waiters and bartenders per night, with an average of three working "off the books", whose tips were attributed to the other 12 for taxation purposes. Assuming an average of $200.00 in tips per shift per bartender or waiter, each employee paid approximately $21.48 more per shift in taxes to account for the "off the books" workers. Using the same 1303 shifts as in Section B above, the total unlawful deductions would be $27,988.44. With liquidated damages, this claim would be worth **$55,976.88.**

D.    THE OTHER THEORIES

Plaintiffs' other theories are extraordinarily hard to calculate without extensive formal discovery, and not likely to be driving factors in terms of settlement value of the case.

RISK DISCOUNTS

All of the claims made in the amended complaint are difficult to substantiate and quantify. The minimum wage claims discussed above require that plaintiffs prove at least one of their other theories applied consistently enough to assert that plaintiffs were not permitted to keep all of their tips. But the reconciliation deductions appear to have been more the product of rogue accountants than a consistent policy, plaintiffs have gotten conflicting statements from various witnesses about the practice, and plaintiffs have been able to provide only one reconciliation sheet with hard evidence of a deduction, for $68.00. We expect that if the practice were widespread and consistent, we would have been able to identify more close-out sheets with deductions on them.

Similarly, the claims that the tip income of off-the-books employees is being attributed to the on-the books workers for tax purposes is a complicated argument to begin with, and an even harder one to substantiate; as it currently stands, there is no hard evidence to substantiate the theory, witnesses have not substantiated it, and the nature of cash restaurant and club tip income makes it extraordinarily difficult to run down any reliable numbers. Furthermore, such calculations may necessarily lead to further inquiries about cash tips reported by plaintiffs.

When plaintiffs first approached counsel about this case, they had complaints about a host of *ad hoc* issues that they perceived as defendants stealing from them. Counsel put together a complaint alleging what appeared to be the most consistent, identifiable practices, but by far the biggest complaint- the perceived withholding of mandatory service charges that were represented as gratuities- turned out to lack merit, based on a review of documents that defendants never had access to before litigation- the party contracts.[5]

In the end, the case contains a disparate set of difficult to prove, difficult to quantify claims. The rough calculations provided above total $188,302.58 maximum potential recovery, exclusive of

---

[5] Furthermore, though the issue seemed to be the most clear-cut and consistent, it was not the most sympathetic, since "party pay" for employees working private parties was 20-25 dollars per hour, instead of the tipped minimum wage, so the employees were not exactly being robbed under those circumstances.

4

attorneys' fees, and the $85,000.00 settlement is approximately 45 percent of that total. A 65 percent discount for risk, plus the time and expense of further litigation, is very reasonable under the circumstances.

Still further complicating settlement value is that plaintiffs were paid different pay rates depending on their function for the evening. There were times they worked parties for $20-$25.00 per hour with no tips, other times they received tips. Calculating the damages for the claims above therefore becomes extraordinarily complex.

ALLOCATION OF THE SETTLEMENT

The plaintiffs are a remarkably close and collegial group, who have supported each other through the litigation. Although this is not a class action, Plaintiffs have agreed among themselves that any settlement should be shared equally, except that Kasheena Shim should receive a somewhat larger share of the settlement for having sought counsel, initiated the litigation, and worked harder and spent more time with counsel strategizing, reviewing documents and discussing theories of the case.[6] Thus, the proposed settlement awards each plaintiff other than Kasheena Shim $10,750.00. It awards Kasheena Shim $13,050.00.[7]

SATISFACTION AND VULNERABILITY OF THE LITIGANTS

Plaintiffs, who each attended at least one mediation, are all educated, competent, apparently savvy and smart individuals. As mentioned above, they are a collegial group, who all felt strongly about the litigation and how they perceive they were treated by defendants. They have all expressed enthusiasm and satisfaction with the proposed settlement, and each has endorsed the settlement agreement (as have defendants). Counsel have no doubt that this proposed settlement "reflects a reasonable compromise of disputed issues rather than a mere waiver of statutory rights brought about by an employer's overreaching." See Le v. SITA Information Networking Computing, USA, Inc., 2008 WL 724155 (E.D.N.Y. Mar. 2008) (internal quotations and citation omitted). See also Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199 (2d Cir. 2015).

Additionally, the settlement amounts compare favorably with plaintiffs' actual earned income during their tenure with defendants. For example, in 2015, Kasheena Shim earned $4392.74 in salary and reported $15,950.20 in tips. In 2015, Nicholas Clark grossed $11,891.99 in salary and reported $7526.76 in tips. Their settlements exceed half of the gross reported annual income for each.

Finally, plaintiffs have not at any time expressed any urgency to settle this matter, or need for money, that would drive any of them to settle for less than a fair value of the litigation.

---

[6] We also have a higher number of documented hours for her.

[7] In the event the Court has any concerns about Kasheena Shim's unequal share, all of the parties have consented to deem the settlement agreement amended to reflect an even split of the settlement among all plaintiffs, which would result in an $11,210.00 settlement check to each plaintiff.

ARMS' LENGTH BARGAINING AND THE ABSENCE OF FRAUD OR COLLUSION

Plaintiffs' counsel and defense counsel did not know each other before this litigation, and attended two vigorously contested, unsuccessful mediations. Plaintiffs' counsel is an experienced firm that focuses on civil rights and employment litigation. There was no fraud or collusion in this matter, and the case was settled at arms' length.

RELEASE OF CLAIMS

While the release here releases all potential claims plaintiffs could bring against defendants to date, plaintiffs' counsel has conferred in depth with each plaintiff to ascertain any potential claims other than those brought here, and is convinced there are no such further claims, other than a workers' compensation claim, which has been excluded from the settlement. Furthermore, the release is not subject to any confidentiality provisions.

ANTICIPATED BURDENS AND EXPENSES IN ESTABLISHING CLAIMS AND DEFENSES

As discussed above, the claims presented here are in part novel, and difficult to prove. They would require extensive further discovery, including electronic discovery, and forensic experts, and are far from a guaranteed victory. Settlement avoids such anticipated burdens and expenses, and avoids the further litigation risks.

ATTORNEYS' FEES

If plaintiffs were to prevail on their claims, they would be entitled to attorneys' fees from defendants under either the FLSA or the NYLL. Although plaintiffs' attorneys' hours total approximately 90 as of this writing, counsel has agreed to accept a one third contingency fee from the gross settlement (as our retainer agreement provides for, unless fees awarded for prevailing at trial exceed such a fee). Thus, a third of the $85,000.00 settlement, or **$28,333.00**, should reasonably be factored into the settlement value of the case. We respectfully submit that this is reasonable in light of the approximately 90.6 hours spent by plaintiffs' counsel in this matter, as documented contemporaneously in Exhibit 3.

One third contingency fees "are commonly accepted in the Second Circuit in FLSA cases." Chamoro v. 293 3rd Café Inc., 16-CV-339 (PAE), 2016 WL 5719799, at *3 (S.D.N.Y. 2016) collecting cases). See also Ezpino v. CDL Underground Specialists, Inc., 14-CV-3173 (DRH)(SIL), 2017 WL 3037483, at *3 (E.D.N.Y. June 30, 2017), report and recommendation adopted, 2017 WL 3037406 (E.D.N.Y. 2017). "Nevertheless, even in such cases, the Court must carefully scrutinize the settlement and the circumstances in which it was reached, if only to ensure that 'the interest of plaintiffs' counsel in counsel's own compensation [did not] adversely

affect the extent of the relief counsel [procured] for the clients.". Pena v. San Miguel Transp., Inc., 14-CV-1463, 2015 WL 1938144, at *2 (S.D.N.Y. 2015) (citations and quotations omitted).

My firm's contemporaneous time records are appended[8]; I am a Partner at Stoll, Glickman & Bellina, LLP, and I supervise the firm's employment litigation practice. I have been practicing law in New York for over 20 years, and have been counsel and lead counsel in certified FLSA collective actions, as well as many individual FLSA and NYLL actions. I am a member of the bar of the State of New York and have also been admitted to practice before the U.S. District Court for the Western, Eastern, Southern and Northern Districts of New York, as well as the Second Circuit Court of Appeals, where I have briefed and argued. I have taught as an adjunct law professor at Seton Hall University School of Law, where I taught "Persuasion and Advocacy", a required trial advocacy course. I have tried over 25 jury trials in a variety of venues, and supervised and second chaired several more. Further, though I have been practicing employment law for six years, I have practiced civil rights litigation generally, predominantly in the Eastern and Southern districts of New York, for over fifteen years.

The time records reflect 81.2 hours of my time, and a limited amount of associate and support staff time. Awarding me a rate of $350.00 per hour would net a total fee of $28,420.00; remarkably close to the one third contingency listed above. Respectfully, the parties are not asking the Court to rule on an hourly rate here, but rather, to approve the contingency fee as cross checked with the reasonableness of the fees as discussed above.[9]

CONCLUSION

The parties submit that the proposed settlement satisfies the "uniquely protective.. remedial purpose" of the FLSA, "to prevent abuses by unscrupulous employers, and remedy the disparate bargaining power between employers and employees", and respectfully request approval of the settlement, pursuant to Cheeks v. Freeport Pancake House, Inc., 796 F.3d 199, 207 (2d Cir. 2015), and Wolinsky v. Scholastic Inc., 900 F. Supp. 2d 332, 335–37 (S.D.N.Y. 2012).

Thank you for your consideration.

Sincerely Yours,

Andrew B. Stoll
Stoll, Glickman & Bellina L.L.P.

---

[8] Limited redactions are to protect investigatory work product.
[9] We also ask the Court approve reimbursement of $617.00 in expenses from the settlement, reflecting a $450.00 filing fee and process serving.